Stephen J. MIRIZIO, Appellant

v.

Cathy JOSEPH and Figure
The Odds, Inc.

Stephen J. Mirizio,

v.

Cathy Joseph and Figure The
Odds, Inc., Appellants.

Superior Court of Pennsylvania.

Argued Dec. 1, 2009.

Filed April 26, 2010.

Reargument Denied June 29, 2010.

1074

John E. Quinn, Pittsburgh, for Mirizio.

David M. Moran, Pittsburgh, for Joseph and Figure The Odds.

BEFORE: MUSMANNO, BENDER and BOWES, JJ.

OPINION BY BENDER, J.:

¶ 1 Stephen Mirizio appeals from the judgment entered in favor of Cathy Joseph and Figure the Odds, Inc., in Mirizio's action in ejectment against Joseph. In the underlying case, Joseph filed several counterclaims against Mirizio, and in her cross-appeal, she claims that she was aggrieved by the disposition of one these claims. For the reasons that follow, we affirm.

¶ 2 The trial court set forth the facts and procedural history of this case as follows:

This civil action culminated in a jury trial held May 19, 20 and 21, 2008. Following the jury's verdict both the Plaintiff hereinafter "Mirizio" and the Defendants (Counterclaim Plaintiffs) hereinafter "Joseph" filed Post-trial Motions. On September 5, 2008 this court entered an Order granting and denying the various Motions of the parties and molding the jury's verdict. From this Order both parties have appealed and it is now incumbent upon this court to address in an Opinion the parties respective Statements of Errors Complained of on Appeal.

This civil action arises out of a dispute between Mirizio and Joseph regarding real estate consisting of land and a warehouse building located in Farrell, Mercer County, Pennsylvania. Mirizio entered into an agreement to purchase the property from Metropolitan Saving Service Corporation by an agreement dated January 26, 2005. Mirizio contends that he had a "casual conversation" with Joseph in which he offered her the "opportunity" in the future to purchase one of the condominium units which he had intended to develop [on] the property in return for one-half the cost of acquiring and developing the property. Joseph contends that there was a specific verbal agreement entered into whereby she was to be a joint purchaser with Mirizio including two side lots as well as the property on which the warehouse is located.

Joseph contends that as a result of the agreement she and Mirizio met in March

2005, viewed the building, and reviewed the general plans for cleaning the building, repairing the roof and building the dividing wall.

On April 19, 2005, a closing was held at which time title to the property was placed in the name of Mirizio and his wife. Joseph alleges that Mirizio did not inform her that a closing had occurred. Mirizio has been a practicing attorney in the Mercer County area since 1974. Real estate is a significant part of his practice. He testified that he had never advised a client to get into a real estate transaction without a written agreement. This case proves the reason for the rule. Mirizio is married to Joseph's sister and his mother-in-law testified at the trial on behalf of Joseph.

In late April, Mirizio began the work of cleaning, repairing and renovating the building which include[ed] repairing the roof and beginning the construction of the interior dividing wall. On May 18, 2005, Joseph sent a check to Mirizio for $40,000.00 which Mirizio accepted. His uncontradicted testimony at the time of trial was that he placed the $40,000.00 in his attorney escrow account. He stated that he never asked for any money because he could not provide an agreement until the condominium documents were completed. Joseph began working on the building in May to make it suitable for her purposes. She engaged the services of an electrical contractor and in late May and June did demolition and reconstruction of the electrical system and begun the construction of a bathroom facility and other renovations. During June, July and August Joseph incurred over $16,000.00 in the construction costs. Joseph relinquished her use of other storage facilities that she used around the Mercer area and began moving her equipment into the warehouse on August 1, 2005. Joseph made pay-

ments to Mirizio of $20,000.00 on September 7, 2005, $15,000.00 on October 11, 2005 and $15,000.00 on December 10, 2005.

On September 9, 2005, Mirizio filed a declaration of condominium creating two condominium units in the warehouse. On November 4, 2005, Mirizio provided Joseph with a proposed agreement of sale for a condominium unit. The agreement of sale was accompanied by an itemization of the acquisition costs as well as the common repair and renovation costs for the building which Mirizio totaled as $191,484.66.

Joseph sent a letter to Mirizio on December 10, 2005 questioning several aspects of the proposed transaction. Joseph questioned why Mirizio "unilaterally excluded from the property the two side lots" adjacent to the warehouse and why she was being charged interest.

It appears that Joseph's letter to Mirizio of December 10, 2005, crossed in the mail with a letter from Mirizio to Joseph of December 5, 2005, sending a revised agreement of sale adding to the itemization "one additional month of interest" in anticipation of a closing in December 2005.

In response to Joseph's letter of December 10, 2005, Mirizio sent a letter of December 22, 2005, again sending a revised agreement asserting the amount now due of $100,742.56. Mirizio stated in the letter that "you may therefore either sign and return the two enclosed agreements or not." Joseph signed the agreement and made a last payment in full of the amount due. Her check memo indicated that it was "payoff for building."

Mirizio sent a letter to Joseph on February 28, 2006, returning the funds he

had accepted and the checks he had not cashed and offering her continued occupancy as a tenant only with the payment of back rent. In addition he demanded that she obtain an occupancy permit. Joseph responded by retaining counsel to address the issues of the claim for rent and the occupancy permit. Mirizio initiated the present action in ejectment asking for possession of the property as well as "recovery of profits for the use thereof." Joseph counterclaimed and requested damages for breach of the "joint venture agreement," damages for "fraud and misrepresentation," for a specific performance of the "joint venture agreement" and damages for "violation of Pennsylvania Uniform Condominium Act."

Mirizio's action in ejectment for possession of the premises as well as Joseph's counter-claim for a specific performance of the alleged joint venture agreement were dealt with by the court prior to [the] jury trial on Plaintiff's Motion for Partial Summary Judgment. This court found that there was [ ]no genuine issue of material fact that (Joseph asserted) a verbal agreement for the sale of real estate which is subject to the statute of frauds and is therefore not subject to specific performance. The court granted Mirizio's Motion for Partial Summary Judgment in ejectment for possession of the premises as well as Partial Summary Judgment in favor of Mirizio and against Joseph on Joseph's counter-claim for specific performance.

After trial the jury was asked the following questions:

Question: As to the claim of Mr. Mirizio for rental damages, was Mr. Mirizio the owner of the property in question from August 1, 2005 to May of 2007?

Answer: Yes.

Question: Did Ms. Joseph or her company occupy the property in question from August 1, 2005 to May 2007?

Answer: Yes.

Question: What is the fair rental value of the property in question for the above-stated period?

Answer: $15,400,00 is awarded as damages in favor of Mr. Mirizio and against Ms. Joseph and her company.

As to claims of Ms. Joseph against Mr. Mirizio:

Question: Was there an oral contract creating a joint venture between Mr. Mirizio and Ms. Joseph?

Answer: Yes.

Question: Did Mr. Mirizio [b]reach that agreement?

Answer: Yes.

Question: What damages to Ms. Joseph were caused by this breach?

Answer: $93,202.05 is awarded in favor of Ms. Joseph and her company and against Mr. Mirizio.

As to Ms. Joseph's claim of fraudulent misrepresentation:

Question: Did Mr. Mirizio commit fraudulent misrepresentation against Ms. Joseph?

Answer: Yes.

Question: What damages were caused to Ms. Joseph by this fraudulent misrepresentation?

Answer: $15,400.00 is awarded in favor of Ms. Joseph and her company and against Mr. Mirizio.

Trial Court Opinion (T.C.O.), 4/14/09, at 1–5. Both parties filed post trial motions, which the court granted in part and denied in part. The parties then filed the appeals presently before us. We shall first address the claims that Mirizio has raised in his appeal and then the issues presented

by Joseph in her cross-appeal. Mirizio has presented the following three questions:

1. Whether the trial court erred in presenting the issue of fraud and misrepresentation to the jury when it is barred by the gist of the action doctrine?

2. Whether the trial court erred in presenting Defendants' (Appellees herein) claim for "replacement" damages to the jury?

3. Whether the trial court abused its discretion in molding the jury's verdict for breach of an oral joint venture agreement?

Brief for Appellant at 6.

■ ¶ 3 In the first question presented for our review, Mirizio claims that Joseph's claim for fraud and misrepresentation was barred by the gist of the action doctrine. In the trial court, Mirizio made several unsuccessful attempts to have this claim dismissed. He filed a motion in limine seeking to preclude evidence thereof, which was denied. At the close of Joseph's case on these issues, Mirizio moved for a directed verdict, which the court denied. Finally, after the jury's verdict in favor of Joseph, Mirizio filed a motion for judgment notwithstanding the verdict, which the court also denied. Mirizio now claims that the trial court erred as a matter of law in not entering JNOV.

There are two bases upon which a [JNOV] can be entered: one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, a court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second, the court reviews the evidentia-

ry record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Holt v. Navarro,* 932 A.2d 915, 919 (Pa.Super.2007). In the instant case, Mirizio claims that he was entitled to JNOV on the former basis because he is arguing that as a matter of law, the gist of the action doctrine barred Joseph's claims for fraud and misrepresentation. "Concerning any questions of law, our scope of review is plenary." *Id.* "The question of whether the gist of the action doctrine applies is an issue of law subject to plenary review." *eToll, Inc. v. Elias/Savion Advertising, Inc.,* 811 A.2d 10, 15 (Pa.Super.2002).

■ ¶ 4 In *eToll,* this Court adopted the gist of the action doctrine for cases involving claims of fraud.

Generally, the doctrine is designed to maintain the conceptual distinction between breach of contract claims and tort claims. As a practical matter, the doctrine precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims. [In *Bash v. Bell Tel. Co.,* 411 Pa.Super. 347, 601 A.2d 825 (1992),] the Court explained the difference between contract claims and tort claims as follows:

[a]lthough they derive from a common origin, distinct differences between civil actions for tort and contract breach have developed at common law. Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals.... To permit a promisee to sue his promisor in tort for breaches of contract inter se would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions.

*Id.* at 829.

Thus, [a]lthough mere non-performance of a contract does not constitute a fraud[,] it is possible that a breach of contract also gives rise to an actionable tort[.] To be construed as in tort, however, the wrong ascribed to defendant must be the gist of the action, the contract being collateral. The important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus. In other words, a claim should be limited to a contract claim when the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied by the law of torts.

*Id.* at 14 (quotation marks and citations omitted).

¶ 5 In *eToll*, the parties had entered into an agreement to market and advertise an email product that eToll had developed. eToll filed a four-count complaint against Elias/Savion, alleging: 1) fraud for: a) misrepresenting the expertise possessed by Elias/Savion to market the product; and b) executing several schemes such as overbilling and contracting for unnecessary goods and services in order to fraudulently obtain money from eToll; 2) breach of fiduciary duty; 3) professional negligence; and 4) breach of contract. Elias/Savion moved for summary judgment claiming, *inter alia*, that Counts I and III for fraud and professional negligence, were barred by the gist of the action doctrine. The trial court granted the motion for summary judgment as to all of eToll's tort claims, but denied the motion as to the breach of contract claim. However, eToll discontinued the contract claim so that it could file an immediate appeal to this Court.

¶ 6 On appeal, eToll claimed that the trial court erred in applying the gist of the action doctrine and dismissing the tort claims. After conducting a comprehensive survey of the case law on the gist of the action doctrine, we outlined the scope of the doctrine as follows:

[P]ersuasive authority interpreting Pennsylvania law has restated the gist of the action doctrine in a number of similar ways. These courts have held that the doctrine bars tort claims: (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself where the liability stems from a contract; (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract.

These courts have **not** carved out a categorical exception for fraud, and have not held that the duty to avoid fraud is always a qualitatively different duty imposed by society rather than by the contract itself. *Rather, the cases seem to turn on the question of whether the fraud concerned the performance of contractual duties. If so, then the alleged fraud is generally held to be merely collateral to a contract claim for breach of those duties. If not, then the gist of the action would be the fraud, rather than any contractual relationship between the parties.*

*Id.* at 19 (quotation marks and citations omitted) (second emphasis added). We went on to hold that the doctrine should apply to claims for fraud in the performance of a contract. *See id.* at 20.

¶ 7 Applying these principles to the facts in *eToll*, we reasoned that the gist of the action doctrine barred eToll's fraud claims.

Appellant contends that the Appellees perpetuated a number of fraudulent

schemes in the course of the parties' contractual relationship. For example, Appellant alleged that the Appellees: (1) deceived Appellant into thinking that certain goods and services were being billed to Appellant at cost, when in fact the Appellees were charging inflated prices; (2) deliberately submitted bills containing fictitious charges and unauthorized markups; (3) concealed less expensive ways to accomplish a market launch of the product; (4) took undisclosed kickbacks and commissions; (5) told [A]ppellant that they had performed certain services under the contract when they had not done so; (6) misrepresented to [A]ppellant that certain targets had no interest in email products, when in fact interest was high; and (7) concealed these schemes in order to perpetuate the overbilling and fraud.

All of these alleged acts of fraud arose in the course of the parties' contractual relationship. Moreover, the Appellees' duties regarding billing and performance were created and grounded in the parties' contract. Finally, these are the types of damages which would be compensable in an ordinary contract action; thus, the claim would essentially duplicate a breach of contract action to recover the allegedly-overbilled charges. The fraud at issue was not so tangential to the parties' relationship so as to make fraud the gist of the action. Rather, we conclude that the fraud claims are inextricably intertwined with the contract claims. Because the gist of Appellant's fraud action lies in contract, the trial court did not err as a matter of law in dismissing the fraud claim under the gist of the action doctrine.

*Id.* at 20–21.

¶ 8 In the instant case, the trial court concluded that the gist of the action doctrine was "inapplicable because of the fiduciary duties imposed upon [Mirizio] as a joint-venturer." Order, 9/3/08, at 1. In so holding, the trial court relied primarily on *Bohler–Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79 (3rd Cir. 2001). In *Bohler–Uddeholm*, the parties had entered into a joint venture agreement for the development of a steel ingot mill in Ellwood City, Pennsylvania. Uddeholm was a Swedish company that produced specialty tool steels and Ellwood was a Pennsylvania company in the business of forging steel ingots into a variety of components for heavy machinery. In the past, Ellwood had relied on outside manufacturers to provide it with steel ingots, but had decided to build its own steel mill to supply ingots for its forging business. Around this time, Uddeholm had decided that it wanted to build a steel mill in the United States so as to avoid quotas on its imports of steel ingots from Sweden. Thus, the parties agreed to jointly develop a mill that would produce the type of steel ingots the parties desired, which was named Ellwood–Uddeholm Steel Company (EUS), in which Ellwood took an eighty percent interest and Uddeholm owned the remaining twenty percent interest. The parties' Business Plan stated that " '[t]he principal purpose of EUS will be to supply high quality ingots to its owners, Ellwood City Forge Corporation and Uddeholm Tooling AB,' and that '[i]ngots shall be cast in a variety of shapes and weights according to the requirements of Ellwood City Forge Corporation and Uddeholm Tooling AB.' " *Id.* at 88.

¶ 9 In creating EUS, the parties entered into several agreements. Ellwood ran the daily operations of EUS and the parties agreed that EUS would sell ingots to Uddeholm and Ellwood at a price equal to the cost of producing the ingots, plus overhead, which was originally set at thirty-five percent over cost. Their agreement also contained a rebate program, which was

designed to ensure that each party paid no more than their share of overhead costs, *i.e.*, eighty percent for Ellwood and twenty percent for Uddeholm. The rebate program operated by reimbursing Ellwood or Uddeholm when either paid an amount for overhead (these overhead payments were part of the price they paid for steel ingots from EUS) that exceeded their annual share of the actual overhead costs of operating EUS. Conversely, if either party's contribution to overhead totaled less than that party's percentage control of EUS, that party would have to make up the shortfall in overhead costs by paying EUS the difference. The purpose of this rebate program was to ensure that Ellwood paid eighty percent of overhead costs and Uddeholm paid twenty percent of overhead costs, regardless of how much steel each party was purchasing.

¶ 10 After EUS began operating, EUS sold a substantial amount of steel ingots to Ellwood that ended up going to third parties in unchanged form. Thus, Ellwood operated as a middleman for these third parties to purchase steel ingots from EUS. Upon discovering these sales, Uddeholm claimed that Ellwood had mischaracterized these sales as "purchases" by Ellwood when in fact they were sales to third parties that had simply been channeled through Ellwood. Uddeholm claimed that Ellwood did so for the purpose of inflating the rebate it received on purchases, and ostensibly, for re-directing third party sales that EUS would have made to Ellwood. Ellwood claimed that these third party sales qualified as purchases under the parties' agreement and that it properly received these rebates even though it was not using the ingots itself because it was entitled to reimbursement of any overhead costs paid in excess of its eighty percent responsibility for EUS's overhead.

¶ 11 This dispute led to legal action between the parties wherein Uddeholm asserted a claim against Ellwood for breach of contract along with several tort claims. Among the tort claims were claims for breach of fiduciary duty and for misappropriation of trade secrets and confidential information. Ultimately, the case went to a jury, which returned a verdict in favor of Uddeholm on several of its claims.

¶ 12 Ellwood appealed and relying on the gist of the action doctrine, it claimed that the tort claims were barred because Uddeholm's only remedy was for breach of contract. On the first tort claim for breach of a fiduciary duty, the court began by noting that since the parties had entered into a joint venture, there existed a fiduciary duty between them. *See Snell-baker v. Herrmann*, 315 Pa.Super. 520, 462 A.2d 713, 718 (1983) (stating that "a joint venturer owes a fiduciary duty of the utmost good faith and must act toward his associate with scrupulous honesty").[1] The court summarized the parties' argument as follows:

> Ellwood contends that the Agreement was exhaustively negotiated and completely defined the parties' relationship and obligations, so that Uddeholm's alleged losses arose only from alleged breaches of the Agreement. Ellwood asserts that, far from being collateral to the breach of fiduciary duty claim, the Agreement was the only articulated predicate for that claim. **Conversely,**

---

1. While not applicable to the case before us, the court in *Bohler–Uddeholm* also found that Ellwood owed Uddeholm a fiduciary duty because Ellwood was a majority partner and Uddeholm was a minority partner. *See Fer-ber v. American Lamp Corp.*, 503 Pa. 489, 469 A.2d 1046, 1050 (1983) (stating that "majority stockholders occupy a quasi-fiduciary relation toward the minority which prevents them from using their power in such a way as to exclude the minority *from their proper share of the benefits accruing from the enterprise* ").

Uddeholm contends that Ellwood's rebate claims for third-party sales and its covering up of these sales breached its fiduciary duty to Uddeholm, because such actions involved Ellwood utilizing the joint venture for its own gain to the detriment of its minority partner. Uddeholm claims that these actions by Ellwood caused losses that went beyond the scope of the Agreement, thus giving rise to a cause of action separate from the breach of contract claim. Uddeholm contends further that, because the existence of a contract between two parties does not preclude one of the parties from recovering in tort for a breached fiduciary duty, it should be allowed to recover for Ellwood's breached fiduciary duty in this case.

*Bohler–Uddeholm,* 247 F.3d at 104 (emphasis added).

¶ 13 The court concluded that while the parties entered into several agreements governing most of the aspects of their joint venture, these agreements did not cover the alleged wrong committed by Ellwood in Uddeholm's breach of fiduciary duty claim.

As suggested by the foregoing, the obligations that Uddeholm alleges Ellwood breached in its fiduciary duty claim were imposed as a matter of social policy rather than by mutual consensus. That is, the larger social policies embodied in the law of torts rather than the terms of the contract, are what underlie Uddeholm's breach of fiduciary duty claim. The larger social policy that defines Uddeholm's claim is the policy requiring fair dealing and solicitude from a majority shareholder to minority shareholders in a joint venture. We thus conclude that Uddeholm's fiduciary duty claim meets the gist of the action test: the tort wrong ascribed to Ellwood is the gist of the fiduciary duty action while the Agreement is collateral.

*Id.* at 105 (footnote, quotation marks and citations omitted). Thus, although Uddeholm would not have had a breach of fiduciary duty claim against Ellwood was it not for the parties' relationship arising from the EUS joint venture, which was established pursuant to a contract, the court concluded that the contract was collateral to Uddeholm's claim for breach of fiduciary duty. It is important to note for purposes of our discussion *infra* that Uddeholm's claim for breach of fiduciary duty was based on actions by Ellwood that were outside the scope of the parties' contractual duties, *i.e.,* they were neither permitted nor proscribed by the parties' agreements.

¶ 14 The court next considered Uddeholm's tort claim for misappropriation of trade secrets and confidential information, where it arrived at a varied result. This claim was based on two acts by Ellwood: 1) Ellwood's alleged misuse of technical confidential information during a period of time immediately following the dissolution of the joint venture; and 2) Ellwood's act of sending Uddeholm's price lists and customer information to an executive at one of Uddeholm's European competitors before that executive came to work for Ellwood at the corporation that succeeded EUS after the joint venture had been dissolved.

¶ 15 Regarding the first part of the claim, the court focused on the contractual basis for Uddeholm's claim. Uddeholm itself argued that Ellwood was *contractually prohibited* from doing the actions that Uddeholm alleged formed the basis of this claim. Uddeholm admitted that the "Know–How Agreement" between the parties covered the prohibited actions committed by Ellwood. *Id.* at 106. The court concluded that the gist of this part of Uddeholm's misappropriation of trade secrets and confidential information claim

was actually breach of contract, and therefore, was barred by the gist of the action doctrine.

¶ 16 The court reached a different result for the second part of the claim. Though the price lists and customer information misappropriated by Ellwood under this claim were not covered by the parties various agreements, they were nonetheless considered trade secrets under Pennsylvania law. *See A.M. Skier Agency, Inc. v. Gold,* 747 A.2d 936, 940 (Pa.Super.2000) (stating that "[i]n many businesses, permanent and exclusive relationships are established between customers and salesmen. The customer lists and customer information *which have been compiled by such firms* represent a material investment of employers' time and money. This information is highly confidential and constitutes a valuable asset. Such data has been held to be property in the nature of a 'trade secret' for which an employer is entitled to protection, independent of a non-disclosure contract") (quotation marks omitted). Consequently, the court concluded that the parties' contract was collateral to this claim, and therefore, it was not barred by the gist of the action doctrine.[2]

 ¶ 17 As the foregoing indicates, in determining whether a particular tort claim is barred by the gist of the action doctrine, the central analysis is whether the tort claim is based on contractual duties, or conversely, whether the contract is collateral to a tort claim that is based on duties imposed by "larger social policies embodied in the law of torts." *Bohler–Uddeholm,* 247 F.3d at 105. Importantly, in any given case, there may be particular tort claims that are barred by the gist of the action doctrine while others are not. We are persuaded by the court's reasoning

in *Bohler–Uddeholm,* and shall now apply it to the facts of the case before us.

 ¶ 18 In this case, the matter proceeded to trial on three counts: 1) breach of contract; 2) breach of fiduciary duty; and 3) fraud and misrepresentation. Although the trial court instructed the jury on the breach of fiduciary duty claim, Reproduced Record (R.) at 792a–96a, there were no jury interrogatories addressing the claim. R. at 1009a–11a. In its opinion, the trial court, citing *Bohler–Uddeholm,* ruled that the fraud and misrepresentation claim was not barred by the gist of the action doctrine because a fiduciary duty existed between the parties. The court stated: "It is the joint venture agreement that creates fiduciary duties that are distinct from the contractual duties contained in the joint venture agreement and thus not barred by the gist of the action doctrine." T.C.O., 4/14/09, at 6. The court's analysis of this issue is limited to one short paragraph and it does not explain how the fraud and misrepresentation claim is related to the fiduciary duty between the parties. Moreover, our reading of the court's jury instructions on these claims reveals no linkage between the two claims.

¶ 19 On appeal, Joseph argues,

Pennsylvania law imposes a fiduciary duty relationship between the parties to a joint venture agreement which imposes duties beyond the scope of the contractual agreement and, therefore, Joseph's claim for fraud and misrepresentation arising out of the breach of the fiduciary relationship was not barred by the gist of the action doctrine.

Brief for Appellees at 6. Joseph's argument presents an attempt to conflate the

---

2. For purposes of our discussion *infra* we note here that the court reached this conclu-

sion independent of its analysis of the breach of fiduciary duty claim.

two claims. Both the trial court and Joseph intertwined the fiduciary duty arising out of the joint venture with Joseph's claim for fraud and misrepresentation where in fact these are two separate and distinct claims.[3] There is no basis in fact to support Joseph's claim that the fraud and misrepresentation claim arises from Mirizio's fiduciary duty to her rather than from the agreement between the parties to jointly purchase and develop the subject property. The averments in Joseph's Amended New Matter and Counterclaims do not allege facts that are outside the scope of the parties' agreement, such as the third party sales in *Bohler–Uddeholm*.

¶ 20 Nor is there any such relationship between the claims implied by law, as a fraud and/or misrepresentation claim is obviously sustainable independent of whether there exists a fiduciary duty between the parties. Joseph further confuses the issue when she construes the court's holding in *Bohler–Uddeholm* in an overly broad manner. Thus, she claims that the court "plainly held that once there is found a fiduciary duty that is imposed on a party by the larger social policies of the law, then other fraud or misrepresentation claims may be permitted." Brief for Appellees at 16. First, the court was not presented with either a fraud or misrepresentation claim in *Bohler–Uddeholm*. Second, the court in *Bohler–Uddeholm* addressed each of the torts separately and independent of one another. Thus, contrary to Joseph's assertion, the existence of a fiduciary duty does not create a type of overarching shield against the gist of the action doctrine so that a party may assert various tort claims in a contract case. Rather, a claim for breach of fiduciary duty is independent of any other tort claims, and each of these claims must be based on factual circumstances in which the parties' contractual duties are collateral to the claim. The fiduciary duty, therefore, does not impart blanket protection under which a party can assert various tort claims regardless of their relationship to the contract at hand. Each tort claim must be analyzed independently and a determination made as to whether the tort claim is the gist of the action and the contract is collateral to the matter. Therefore, we conclude that the trial court erred in determining that the fraud and misrepresentation claim was not barred by the gist of the action because of the fiduciary duty that existed between the parties.

¶ 21 Having determined that the trial court erred in so ruling, we nonetheless affirm its decision on an alternative basis. *See The Brickman Group, Ltd. v. CGU Ins. Co.*, 865 A.2d 918, 928 (Pa.Super.2004) (stating, "We are not bound by the trial court's rationale, and may affirm its ruling on any basis."). While the gist of the action doctrine may bar a tort claim arising from the performance of a contract it does not "bar a fraud claim stemming from the fraudulent inducement to enter into a contract." *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 719 (Pa.Super.2005). For the reasons that follow, we conclude that Mirizio's actions constituted fraud in the inducement, and therefore, the claim for fraud and misrepresentation was not barred by the gist of the action doctrine.

¶ 22 In Joseph's brief, she argues that in her pleadings and at trial she "pled and proved clear convincing evidence of fraud

---

**3.** In his brief, Mirizio claims that Joseph's attempt to link the breach of fiduciary duty claim to the fraud and misrepresentation claim is in essence an effort to simply "bootstrap" her fraud and misrepresentation claim to the breach of fiduciary duty claim. Brief for Appellant at 19.

in the inducement or the inception of the contract." Brief of Appellees at 17. She cites Paragraph Fifteen of her Amended New Matter and Counterclaim wherein she averred:

> **At the time that Mirizio and Joseph entered into the joint venture agreement** as herein set forth, Mirizio did not inform Joseph of any **intent on the part of Mirizio** to obtain title to the property solely in his name, establish the property as a condominium or retain the right to [sell] or refuse to [sell] the property to Joseph.

R. at 5 (emphasis added).

¶ 23 In *Sullivan*, the plaintiff sued his former employer asserting several claims, among which were claims for breach of contract and fraud. The plaintiff had been hired by the firm to do marketing and handle client services. He was paid a base salary plus a bonus based on the revenue he generated. His salary began at the rate of $150,000. In his second year with the firm, his salary was raised to $175,000 and he received a bonus of $75,000. The following year, the firm proposed a change to the plaintiff's compensation structure in which it would increase his salary but alter the method for calculating his bonus. This was to be done in a way that would ensure that the plaintiff made no less than he did the previous year. The plaintiff agreed to this change. The next year, the plaintiff was offered an ownership interest in the firm, which he agreed to, but deferred the exercise of the option to purchase this interest due to tax implications. Later that year, a senior executive informed the plaintiff that he in fact would not become an owner, would not be promoted and suggested that the plaintiff seek employment elsewhere. The plaintiff did not resign immediately, however, as the firm requested that he continue his marketing work, introduce influential business clients to his replacement, and organize a golf outing for clients, and in exchange, the firm would provide him with a severance package and compensate him for the ownership interest he was supposed to receive. The plaintiff agreed and ostensibly he performed the requested duties, but when his employment with the firm ceased, the firm did not honor its commitments.

¶ 24 The firm filed preliminary objections to the plaintiff's complaint claiming that the plaintiff's tort counts should be dismissed based on the gist of the action doctrine. The court agreed and dismissed the complaint, in part, on this basis. The plaintiff filed an appeal, and one of the issues we addressed was whether the fraud claim was barred by the gist of the action doctrine. We reasoned that it was not barred, as the facts indicated fraud in the inducement.

> Herein, the Compensation Agreement and the Severance Agreement clearly govern the parties' contractual relationship; however, Appellant's allegations do not relate to Appellee's failure to perform its obligations under the contracts. Rather, the tort claims that Appellant raised in his amended complaint relate to Appellee's fraudulent promises that induced Appellant to enter the contracts. Specifically, Appellant alleged that Appellee fraudulently and/or negligently agreed to perform obligations **that it never intended to perform** in order to induce Appellant to agree to the proposed changes to his compensation package and to forgo an immediate resignation. Accordingly, we conclude that since Appellant's tort claims relate to the inducement to contract, they are collateral to the performance of the contracts and therefore, are not barred by the gist-of-the action doctrine.

*Sullivan,* 873 A.2d at 719 (emphasis added) (citations omitted).

¶ 25 Turning to the facts of the case before us, we also conclude that the facts demonstrate that Mirizio never intended to perform the duties he agreed to. Rather, as Joseph alleges, the facts demonstrated that Mirizio intended to purchase the property in his name, rehabilitate the property with substantial aid from Joseph, and develop it into a condominium with the intent of selling Joseph one of the condominiums after she had expended significant sums on the property. The clear purpose of this scheme was to induce Joseph to share the costs and risk of development and then cut her out of her share of the profit. Moreover, the facts indicate that Mirizio knew that after Joseph had been induced to sink substantial capital into the project, she would in essence be committed to the property and have few if any options other than to accept Mirizio's offer to purchase the property, which she had redeveloped, as a condominium. Therefore, the gist of Joseph's fraud claim is that Mirizio fraudulently induced her to enter into an agreement, and the performance of Mirizio's duties under the agreement was collateral to this fraudulent scheme. Accordingly, we conclude that Joseph's fraud claim was not barred by the gist of the action doctrine.

¶ 26 This does not conclude our disposition of Mirizio's first question presented for our review, as he also has included a weight of the evidence claim within this question. Therein, he claims that the jury's verdict on the fraud and misrepresentation claim was against the weight of the evidence and that the trial court erred in denying his post trial motion presenting this claim.

Given the primary role of the jury in determining questions of credibility and evidentiary weight, this settled but extraordinary power vested in trial judges to upset a jury verdict on grounds of evidentiary weight is very narrowly circumscribed. A new trial is warranted on weight of the evidence grounds only in truly extraordinary circumstances, *i.e.*, when the jury's verdict is *so contrary to the evidence that it* shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. This Court has also noted that one of the reasons that the power and duty to upset a verdict on weight grounds is so narrowly circumscribed is because of the obvious tension between the broad, settled, exclusive role of the fact-finder in assessing credibility and the limited power of trial judges, in narrowly circumscribed circumstances, to overturn those assessments when the judicial conscience is not merely disappointed, or uncomfortable, but shocked.

*Criswell v. King*, 575 Pa. 34, 834 A.2d 505, 512–13 (2003) (citations and quotation marks omitted).

¶ 27 In Mirizio's argument on this issue, he refers to several documents indicating that he and his wife were the sole owners and that a declaration of condominium had been filed for the property. He claims that faced with these documents, Joseph could not "have justifiably relied upon any alleged misrepresentation of [Mirizio]." Brief for Appellant's at 27. The glaring hole in this argument is that these documents were provided to Joseph after the summer of 2005, by which time she had already spent a considerable sum of money redeveloping the property. Furthermore, as stated above, the crux of the fraud claim in this case was in the inducement to enter into an agreement which occurred at the beginning of 2005 when the parties entered into a joint venture. It is of no consequence that Mirizio later revealed that he and his wife were the sole owners and that the property was now a condo-

minium, because these revelations did not occur until several months after the alleged fraud had already transpired. Therefore, we conclude that this issue is wholly without merit.

¶ 28 In the second question presented for our review, Mirizio claims that the trial court erred as a matter of law in presenting Joseph's claim for expectation damages to the jury. Under Section 344 of Restatement (Second) of Contracts, one of the remedies available to a successful party in a breach of contract claim is "his 'expectation interest,' which is his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed." Restatement (Second) of Contracts § 344(a) (1979).

¶ 29 Although Mirizio admits that "where the oral agreement has been obtained by fraud ... [,]a party may recover as damages the loss of his bargain," he also argues that Joseph "never claimed that [she was] fraudulently induced to enter into the agreement." Brief for Appellants at 34. Conversely, Joseph argues that the evidence at trial "clearly establishes that there was fraud in the inducement of the contract." Brief for Appellees at 24. As our discussion *supra* concludes, the facts of this case show that Mirizio fraudulently induced Joseph to enter into an agreement with him based on his misrepresentation to her that they would jointly develop the property together, when in fact his plan was to benefit from her expenditure of money and resources during the redevelopment and then sell the property to Joseph as a condominium, even though she had redeveloped it herself, thereby reaping the benefit of the redevelopment project to the exclusion of Joseph. "Where the oral agreement has been obtained by fraud, however, the buyer may recover as damages the loss of his

bargain.... Such fraud must be actual fraud that reaches back to the original contract." *Weir v. Rahon*, 279 Pa.Super. 508, 421 A.2d 315, 317 (1980) (citations and quotation marks omitted). Since the fraud in this case occurred at the inception of the parties' oral agreement, we conclude that the trial court did not err in submitting the issue of expectation damages to the jury.

¶ 30 In the third question presented for our review, Mirizio claims that the trial court erred in molding the verdict.

It is well settled that a trial court in this Commonwealth has the power to mold a jury's verdict to conform to the clear intent of the jury. The power of a trial judge to exercise his discretion in molding a verdict to fit the expressed desires of the jury is a corner-stone of the jury system. Moreover, [v]erdicts which are not technically correct in form but which manifest a clear intent on the part of the jury may be corrected without resort to further jury deliberations or the grant of a new trial.

*Mitchell v. Gravely Intern., Inc.*, 698 A.2d 618, 623 (1997) (citations and quotation marks omitted).

¶ 31 We begin by noting that Mirizio in fact benefited from the trial court's molding of the verdict. While the jury awarded Joseph $15,400 for her fraud claim, the trial court determined that this award was in error and was improper. Consequently, it struck this part of the jury's award. Joseph challenges this ruling in her cross-appeal, which we shall discuss *infra*. Though the jury awarded Joseph $93,202.05 for her breach of contract claim, it is undisputed that the evidence adduced at trial showed that her damages for this claim were $25,897.01. Furthermore, her expectation damages for her fraud claim were $67,305.04. The sum of these

amounts is exactly $93,202.05. The trial court reasoned that the jury's "error not to separate [these damages] was a technical one which the court could correct." T.C.O., 4/14/09, at 7. Upon review, we discern no abuse of discretion in this ruling.

¶ 32 Next, we address the two issues presented by Joseph in her cross-appeal:

I. Did the Trial Court err[ ] in ruling as a matter of law that the jury could consider the claim for loss rental value arising from an implied landlord/tenant relationship between Mirizio and Joseph arising solely out of Mirizio's ownership of the property and Joseph's occupancy of the property and instructing the jury that it was required to find a fair rental value in favor of Mirizio arising solely from Mirizio's ownership of the property and Joseph's occupancy of the property?

II. Did the Trial Court err[ ] in striking the $15,400.00 from the jury verdict in favor of Joseph as damages for rental expense incurred by Joseph as a result of Mirizio's breach of contract and/or fraudulent misrepresentation?

Brief for Cross–Appellants at 5.

¶ 33 In Joseph's first question, she claims that the trial court erred in permitting the jury to consider Mirizio's claim for loss of rental value.[4] In particular, Joseph argues that "the evidence was clear that in fact the parties never entered into an express or implied lease agreement." Brief of Cross–Appellants at 14.

A lease embraces any agreement, whether express or implied, which gives rise to the relationship of landlord and tenant. When ... the facts are not in dispute[,] the existence of the landlord and tenant relation is a question of law for the court. A tenant is one who occupies the premises of another in subordination to the other's title and with his assent, express or implied. The agreement may be in writing or parol and the reservation of rent is not essential to the creation of the landlord and tenant relation.

*Lasher v. Redevelopment Auth. of Allegheny County,* 211 Pa.Super. 408, 236 A.2d 831, 833 (1967) (citations omitted). In *Lasher,* this Court found the existence of a lease even though there was no written lease, nor was rent ever paid. Likewise, we here conclude that the circumstances indicate that Mirizio, as owner of the property, regardless of how he achieved this end, was entitled to fair market rental value for the time that Joseph spent occupying the premises.

¶ 34 In the second question presented for our review, Joseph claims that the trial court erred in denying her motion to mold the verdict so as to attribute the $15,400 award for her fraud claim as damages arising from Mirizio's breach of the joint venture agreement. Instead of molding this portion of the verdict, the court struck it, concluding that the jury had improperly awarded this amount to offset the exact amount that Mirizio was awarded for loss of rental value. It is clear from the jury's verdict that the fact that this

---

4. Mirizio claims that this issue is waived due to Joseph's failure to file an exception at trial. However, the transcript indicates that after the court instructed the jury, Joseph's counsel attempted to file an exception, but the court deemed it unnecessary for preservation of the issue, as the issue had already been discussed in chambers, but off the record. R. at 805a. The court further noted that Joseph's objection to Mirizio's points for charge was sufficient to preserve the issue for our review. *Id.* Under these circumstances, we decline to find the issue waived.

amount was exactly the same as the amount awarded to Mirizio for loss of rental value was not a matter of coincidence. However, there is no legal basis for reimbursing Joseph this rental value as damages. She occupied the premises, and therefore, was liable for the fair market value of this occupancy. Consequently, we conclude that the trial court did not err in striking this award from the verdict, as it was an attempt to negate the damages properly awarded to Mirizio.

¶ 35 Judgment affirmed.