J-S04016-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| STEVEN KARPINSKI, | |
| Appellant | No. 2014 WDA 2014 |

Appeal from the Judgment of Sentence of November 13, 2014
In the Court of Common Pleas of Allegheny  County
Criminal Division at No(s): CP-02-CR-0010642-2014

BEFORE:  BOWES, OLSON AND STRASSBURGER,* JJ.

MEMORANDUM BY OLSON, J.:                      **FILED FEBRUARY 09, 2016**

Appellant, Steven Karpinski, appeals from the judgment of sentence entered on November 13, 2014.  We affirm.

The trial court ably summarized the underlying facts of this case:

> At the suppression hearing, Jeff Sankey [(hereinafter "Sankey")] testified that he owned and operated a lawn and garden shop in the Penn Hills area of Allegheny County. Sankey [testified that] the address of the store was 11125 Frankstown Road.  He [testified] that he also owned property at 11101 Frankstown Road, the main floor of which was formerly leased to an appliance store.  Above the former appliance store, accessed by a common stairway, were five separate offices.  As of April 29, [2014], *per* Sankey, no tenants leased business space on either floor. . . .
>
> [During the suppression hearing,] Sankey was shown a photograph of the exterior door leading to the stairway for the second floor offices.  He pointed out four or five mailboxes, one for each of the upstairs offices, visible inside the door in a common vestibule.

---

*Retired Senior Judge assigned to the Superior Court.

Sankey [testified that] the second floor contained a short hallway from which the separate offices could be entered, with offices on each side of that hallway.[1]  He further [testified] that he gave Appellant permission to live in one of the upstairs rooms after Appellant lost his apartment. [In particular, Sankey testified that he invited Appellant to stay by telling Appellant:  "I have some rooms on the second floor.  You can have one of those rooms."  N.T. Suppression Hearing, 11/13/14, at 10.  Appellant took the offer and Sankey provided Appellant with the key to the main front door of the office complex.  *Id.* at 10 and 16.] . . .

Appellant worked for Sankey off and on repairing small engines and troubleshooting computer problems.  Appellant did not have a lease for or pay rent on any part of 11101 Frankstown Road, nor did he indicate to Sankey that he was using the entire second floor as his living quarters.

_____

[1] Specifically, regarding the building and the layout of the offices, Sankey's testimony was as follows:

Q: Can you explain to the [c]ourt what type of building 11101 Frankstown Road is?

A: Two lower floors is like a warehouse area.  There is a main floor that used to be a used appliance store and a common stairway to the left that goes up to five different offices upstairs.

. . .

Q: Explain to the [c]ourt when you go up to the top of that stairway what do you enter into?

A: The short hallway[.  Then] there are offices on the left, office on the right, and down the hallway there is an office on the left again and one on the right.

N.T. Suppression Hearing, 11/13/14, at 5-6 and 8.

[Further, Sankey testified that he never entered the second floor of the building while Appellant resided there and that he "assumed" that Appellant was occupying only one room in the building: the "room [] on the far left of the . . . [building, down the second floor] common hallway." *Id.* at 11.] Sankey had permitted Appellant to live at that address under this arrangement for a year and a half as of April 29, [2014].

> [fn.1] [The trial court] notes that nothing in this relationship would have precluded Sankey from entering 11101 Frankstown [Road] to show any portion of the property to potential commercial tenants, nor would it preclude Sankey from forcing Appellant to leave the building at any time.

On April 29, [2014], [Corporal Gerhard Goodyear and Corporal John Roche of the Pennsylvania State Police] arrived at the 11125 Frankstown [Road] address and told Sankey that one of his computers had been used to download child pornography. After the [corporals'] search of Sankey's office computers at that address produced no evidence of child pornography, Sankey indicated that Appellant could be using the same wireless connection from Sankey's adjacent property. Accompanied by Sankey, [Corporals Goodyear and Roche] knocked on the exterior stairway door at 11101 Frankstown [Road]. Sankey also placed several phone calls to Appellant which went to voice mail. When no one answered the phone or door, Sankey obtained from his secretary the key to open [the main door. Sankey testified that he opened the door and allowed Corporals Goodyear and Roche access to the second floor. According to Sankey, he assumed that Corporals Goodyear and Roche "were going into the common area and going up to knock on [Appellant's] room." *Id.* at 15].

Corporal [] Goodyear . . . testified that, with Sankey's permission, he and Corporal [] Roche entered the vestibule area just inside the exterior door and proceeded up the stairs. [According to Corporal Goodyear, his expectation was that the "stairwell [was] a common area leading to [the] apartments [on the second floor]. . . . We were going to try and figure out which apartment [Appellant] lived in and knock on the door and speak to him." *Id.* at 44. The

- 3 -

corporals walked up the stairwell and, a]t the entrance to the second floor hallway[,] they came into contact with Appellant, who was standing in the second floor hallway. [As Corporal Goodyear testified, while they were still in the hallway, Corporal Roche "explained to [Appellant] that [they] were in the middle of conducting an investigation. [Corporal Roche] didn't tell [Appellant] specifically the nature of the investigation but asked him if he would be willing to talk to [them] and told [Appellant] he was under no obligation to do so." *Id.* at 33. Appellant "said that was fine and he didn't have a problem with it." *Id.*]

[After Appellant agreed to speak with the corporals, Corporal Goodyear realized that Appellant "had stuff in every room" on the second floor and computer equipment "in the general hallway." *Id.* at 36-37 and 42-43.[2]

_____

[2] Corporal Roche testified that, when he arrived at the top of the stairs, he noticed that all of the second-floor office doors were open. N.T. Suppression Hearing, 11/13/14, at 57. However, Corporal Roche did not provide a specific time for when he realized Appellant was maintaining possessions throughout the entire second floor. As Corporal Roche testified:

> after turning the corner and seeing all the doors and being surprised by [Appellant] walking out, I don't know if I really made the connection [that Appellant maintained possessions throughout the entire second floor] right there and then. I was more surprised of [Appellant] walking out.
>
> I thought this might be a threatening situation potentially. I was more concerned about my security. I'm now in an unexpected situation. And at that point it made sense to identify myself and ask [Appellant] if I could go sit somewhere with him and talk. . . .
>
> So at some point I made a connection this is not what I expected. This person is up here occupying the entire second floor by himself. I expected to walk up here and see a bunch of doors and get into that vestibule area like you would in any apartment complex and now here I sit standing in a completely open second floor and [Appellant] comes walking out.

*(Footnote Continued Next Page)*

- 4 -

> Appellant invited the corporals into one of the rooms and, upon questioning by Corporals Goodyear and Roche], Appellant admitted to downloading child pornography. Corporal Roche testified substantially similar to Corporal Goodyear.

Trial Court Opinion, 4/14/15, at 3-4 (some internal citations and footnotes omitted).

Following Appellant's arrest, the Commonwealth charged Appellant with sexual abuse of children (dissemination of photographs, videotapes, computer depictions and films), sexual abuse of children (intentionally viewing or knowingly possessing child pornography), and criminal use of communication facility.[3]

Prior to trial, Appellant filed a suppression motion. Within this motion, Appellant claimed that the entire second floor of the office complex at 11101 Frankstown Road constituted his personal residence. Appellant's Motion to Suppress, 11/4/14, at 2. According to Appellant, since the police did not have either a search warrant or Appellant's consent to enter the residence, their entry into the second floor of the office complex violated Appellant's constitutional right to be free from unlawful search and seizure. *Id.*

_(Footnote Continued)_ ————————————

> At some point I made a connection that he's living up here all by himself, and I didn't get to a door where I could knock on it and ask to come in.

*Id.* at 57-58.

[3] 18 Pa.C.S.A. §§ 6312(c), 6312(d), and 7512(a), respectively.

Appellant claimed that the trial court must thus suppress all evidence that was obtained as a result of the unlawful entry. *Id.* at 3.

Following a hearing, the trial court denied Appellant's motion to suppress. As the learned trial court explained on the record, it denied the motion for the following reasons:

> An awful lot of interesting issues here. One that I would point out to the owner of the building is that it's unclear that this particular building is zoned for multiple family use of any sort.
>
> It is clearly, by the photograph offered, a retail establishment on the first floor and what the owner described as four to five separate offices, business offices upstairs. So that is an interesting issue for the landlord.
>
> The second issue would be what the owner of the building – and I'm not going to call him the landlord because there is no evidence this was a leased premises or even permitted to be a leased premises under the zoning ordinances in Penn Hills.
>
> The owner of the building had given [Appellant] permission to use one of the offices for an unspecified period of time at no rent while he was essentially homeless. Based on the owner's description of the permission that he gave to use the upstairs of that building and his description that he gave vague permission to use an office up there for [Appellant's] purposes and again the owner's description that the bathrooms in that area were in the common area. It does again seem that this was not a residence of any sort or even an apartment building, but a business area.
>
> Further when [the police] go to it and knock on the downstairs door, the owner tells [the police that Appellant is] not going to hear [them] because [Appellant is] upstairs and assuming [Appellant is] in one of those offices with the door shut, I would imagine. Then you look inside the glass

door, which is again not common for a residence and see multiple mailboxes on the wall.

So the officers entered, go upstairs with one expectation, that this is a business office area, turn the corner and find all of the doors open and see [Appellant]. Upon doing that, they identify themselves which is proper for everyone's safety, the officers as well as [Appellant]. And then [Appellant] volunteers that "I just spoke to the owner and I was coming down to let you in."

It doesn't seem logical to have them run down the stairs and say, "Sir, can we come in?" [Appellant] did not ask them to step out of the common hallway or say, "I don't want you to come in." He then invited them in. And you see the rest of the testimony that [Appellant] cooperated in the process.

So I don't see that the officers had any reason to believe they were doing anything other than entering a common area of a business with multiple offices upstairs. . . .

[W]ith the information I have before me, including the case law provided, it does appear to me that the police believed they had permission from the owner of the business to enter a common area.

. . . [T]he case law is clear that an owner of a business or an apartment complex can give permission to enter a common area. So I will deny the suppression [motion].

N.T. Suppression Hearing, 11/13/14, at 68-72.

Appellant proceeded to a stipulated non-jury trial, after which the trial court found Appellant guilty of all charged crimes. N.T. Trial, 11/13/14, at 88-89. On November 13, 2014, the trial court sentenced Appellant to serve an aggregate term of three to six months in jail, followed by six years of probation, for his convictions.

Appellant filed a timely notice of appeal; Appellant now raises one claim to this Court:

> Whether the trial court erred in failing to grant [Appellant's] motion to suppress when the troopers entered his residence without a search warrant or a valid consent to enter, and no other exception to the warrant requirement applied under the circumstances?

Appellant's Brief at 5 (some internal capitalization omitted).

"Once a motion to suppress evidence has been filed, it is the Commonwealth's burden to prove, by a preponderance of the evidence, that the challenged evidence was not obtained in violation of the defendant's rights." **Commonwealth v. Wallace**, 42 A.3d 1040, 1047-1048 (Pa. Super. 2012) (*en banc*); **see also** Pa.R.Crim.P. 581(H). With respect to an appeal from the denial of a motion to suppress, our Supreme Court has declared:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing the ruling of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record. . . . Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

**Commonwealth v. Eichinger**, 915 A.2d 1122, 1134 (Pa. 2007) (internal citations omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given

their testimony." ***Commonwealth v. Gallagher***, 896 A.2d 583, 585 (Pa. Super. 2006). Moreover, we note that our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing.[4] ***In re L.J.***, 79 A.3d 1073, 1087 (Pa. 2013).

We have explained:

> Although [a]ppellant was charged with a possessory offense and as such has automatic standing to challenge the suppression of the items seized, it was appropriate for the [suppression] court to first examine the question of Appellant's privacy interest in the place searched. ***See Commonwealth v. Peterson***, 636 A.2d 615, 617 (Pa. 1993)[; ***see also Commonwealth v. Enimpah***, 106 A.3d 695, 701-702 (Pa. 2014) ("it is worth noting that in analyzing the merits of a suppression motion, the [suppression] court may, indeed, treat the defendant's privacy interest as a "threshold" or "preliminary" matter. That is to say, if the evidence shows there was no privacy interest, the Commonwealth need prove no more; in terms of the court's review, it need go no further if it finds the defendant has not proven a reasonable expectation of privacy.")]. Both Article 1, Section 8 of the Pennsylvania Constitution and the Fourth Amendment of the United

_____

[4] On October 30, 2013, our Supreme Court decided ***In re L.J.*** In ***L.J.***, our Supreme Court held that our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. ***In re L.J.***, 79 A.3d at 1087. Prior to ***L.J.***, this Court routinely held that, when reviewing a suppression court's ruling, our scope of review included "the evidence presented both at the suppression hearing and at trial." ***See Commonwealth v. Charleston***, 16 A.3d 505, 516 (Pa. Super. 2011), *quoting* ***Commonwealth v. Chacko***, 459 A.2d 311, 317 n.5 (Pa. 1983). ***L.J.*** thus narrowed our scope of review of suppression court rulings to the evidence presented at the suppression hearing. In this case, Appellant's suppression hearing occurred after ***L.J.*** was decided. Therefore, the procedural rule announced in ***L.J.*** applies to the case at bar.

- 9 -

States Constitution have been interpreted as protecting zones where an individual enjoys a reasonable expectation of privacy. *Commonwealth v. Parker*, 619 A.2d 735, 737 (Pa. Super. 1993). While the Pennsylvania Constitution may be employed to guard individual privacy rights against unreasonable searches and seizures more zealously than the federal law, an individual's expectation of privacy in the place searched must be established to invoke constitutional protection. *Commonwealth v. Melilli*, 555 A.2d 1254, 1258 (Pa. 1989). "[I]n order for a defendant accused of a possessory crime to prevail in a challenge to the search and seizure which provided the evidence used against him, he must, as a threshold matter, establish that he has a legally cognizable expectation of privacy in the premises which were searched." *Commonwealth v. Strickland*, 707 A.2d 531, 534 (Pa. Super. 1998), *quoting* *Commonwealth v. Carlton*, 701 A.2d 143, 145-146 (Pa. 1997).

An expectation of privacy will be found to exist when the individual exhibits an actual or subjective expectation of privacy and that expectation is one that society is prepared to recognize as reasonable. *Commonwealth v. Jones*, 874 A.2d 108, 118 (Pa. Super. 2005). In determining whether a person's expectation of privacy is legitimate or reasonable, the totality of the circumstances must be considered and the determination will ultimately rest upon a balancing of the societal interests involved. *Peterson*, 636 A.2d at 619. "The constitutional legitimacy of an expectation of privacy is not dependent on the subjective intent of the individual asserting the right but on whether the expectation is reasonable in light of all the surrounding circumstances." *Jones*, 874 A.2d at 118.

*Commonwealth v. Viall*, 890 A.2d 419, 421-422 (Pa. Super. 2005) (parallel citations omitted).

On appeal, Appellant claims that the trial court erred in concluding that he was given permission to occupy only one of the offices on the second floor of the building – and, in further concluding that the second-floor entryway and hallway were "common areas" of the building. Appellant's

Brief at 14; ***see also*** N.T. Suppression Hearing, 11/13/14, at 72. According to Appellant, "[t]he facts in the instant case plainly establish[] that [Appellant's] residence consisted of the entire second floor of the building." Appellant's Brief at 28. Starting from this premise, Appellant then writes:

> [a]lthough Sankey had the ability to enter the second floor for inspection and maintenance purposes, he did not have the authority to allow the police to search or enter [Appellant's] residence. Because the [police] entered [Appellant's] residence without a warrant or [] valid consent, and since no other exception to the warrant requirement was applicable, [Appellant's] [] federal and state constitutional rights against unreasonable searches and seizures were violated. And because the [police] obtained the evidence against [Appellant] . . . only as a result of their illegal search and entry, the "fruit of the poisonous tree" doctrine required that the evidence be suppressed.

***Id.*** at 28-29 (internal emphasis omitted).

Here, Appellant was charged with a possessory offense; thus, Appellant has automatic standing to challenge the search. However, Appellant's claim fails because Appellant did not have a reasonable expectation of privacy in either the entryway to the second floor or the second-floor hallway.

To begin, we note:

> A lease embraces any agreement, whether express or implied, which gives rise to the relationship of landlord and tenant. When the facts are not in dispute[,] the existence of the landlord and tenant relation is a question of law for the court. A tenant is one who occupies the premises of another in subordination to the other's title and with his assent, express or implied. The agreement may be in writing or parol and the reservation of rent is not essential

- 11 -

> to the creation of the landlord and tenant relation. . . .
> [T]his Court [has] found the existence of a lease even
> though there was no written lease, nor was rent ever paid.
> [**See Lasher v. Redevelopment Auth.**, 236 A.2d 831, 833
> (Pa. Super. 1967)].

***Mirizio v. Joseph***, 4 A.3d 1073, 1089 (Pa. Super. 2010) (internal citations, quotations, and corrections omitted).

In this case, the trial court concluded that Sankey permitted Appellant to live in only **one** of the offices on the building's second floor. N.T. Suppression Hearing, 11/13/14, at 69 ("[t]he owner of the building had given [Appellant] permission to use one of the offices for an unspecified period of time at no rent while he was essentially homeless"). This conclusion is thoroughly supported by the record. Indeed, Sankey testified that, when he invited Appellant to stay in the office building, he provided Appellant with the following offer: "I have some rooms on the second floor. You can have **one** of those rooms." N.T. Suppression Hearing, 11/13/14, at 10 (emphasis added). Sankey testified that Appellant accepted this offer. ***Id.*** ("And I said, 'I have some rooms on the second floor. You can have one of those rooms.' And he took it."). Thus, Sankey expressly assented to – and Appellant accepted – a relationship where Appellant would occupy only one of the rooms on the building's second floor.

Further, the record supports the trial court's conclusion that Sankey did not impliedly assent to Appellant's occupancy of the entire second floor. As Appellant notes, it is true that Sankey provided Appellant with a key to

the front door of the building – and not to a specific room on the second floor. Appellant's Brief at 19; *see also* N.T. Suppression Hearing, 11/13/14, at 16. However, there is no evidence that Sankey knew or had a reason to know that Appellant was occupying more than one room on the second floor. *See*, *e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 19(2) ("[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents"). First, Appellant never informed Sankey that he was occupying the entire second floor of the building. N.T. Suppression Hearing, 11/13/14, at 11. Second, Sankey testified that he assumed Appellant was living in the second floor's "far left" office because he only "saw the lights on [in] the [building's far] left" office. *Id.* Finally, even on April 29, 2014, when Sankey allowed the police entry into the building, Sankey believed that Appellant was occupying only one room on the second floor. Certainly, as Sankey testified at the suppression hearing, when he allowed Corporals Goodyear and Roche into the building on April 29, 2014, he assumed the corporals "were going into the common area and going up to knock on [Appellant's] room." *Id.* at 15.

Given this evidence, Appellant is incorrect to claim that "[t]he facts in the instant case plainly establish[] that [Appellant's] residence consisted of the entire second floor of the building." Appellant's Brief at 28. Rather, in accordance with our standard of review, we conclude that the record

supports the trial court's conclusion that Sankey assented to Appellant's occupancy of only one office on the second floor of the building – and that Appellant's residence did not encompass the entrance to the second floor or the second-floor hallway.[5]

Further, we conclude that the record supports the trial court's conclusion that the second-floor entryway and hallway were "common areas" of the building, where Appellant did not possess a legitimate expectation of privacy. **See** N.T. Suppression Hearing, 11/13/14, at 72.

As this Court has held, a tenant does not have a legitimate expectation of privacy in the common hallway and stairs of a multiunit apartment building. **Commonwealth v. Reed**, 851 A.2d 958, 962 (Pa. Super. 2004). Our holding in **Reed** was based upon the fact that a tenant simply does not

_____

[5] Within Appellant's brief to this Court, Appellant makes much of the fact that Sankey provided him with a key to the front door of the building – and not to a specific room on the second floor. Appellant's Brief at 19; **see also** N.T. Suppression Hearing, 11/13/14, at 16. According to Appellant, this evidence proves that Sankey gave him permission to "set up residence throughout the entire second floor." Appellant's Brief at 19. However, as explained above, Sankey explicitly testified that he permitted Appellant to live in only one of the offices on the second floor. Further, Sankey testified that, during the entirety of Appellant's stay, Sankey believed that Appellant was occupying only one office in the building. Moreover, we note that Appellant did not testify at the suppression hearing. Therefore, the record does not contain any testimony from Appellant that would contradict Sankey's testimony regarding their contractual relationship. **See Strickland**, 707 A.2d at 534 (holding that the defendant has the burden of establishing that he had an expectation of privacy in the premises that were searched).

have the "right to exclude" residents or other authorized individuals from accessing the shared areas in an apartment building. The *Reed* Court held:

> The crucial distinction between protected and unprotected areas . . . is whether an unrelated person has unfettered access to the area. If even one unrelated person has an unfettered right to access an area, the area is not protected in Pennsylvania from government searches and seizures.

*Id.* (internal footnotes omitted).

In this case, Sankey permitted Appellant – and Appellant agreed – to live in **one** of the five offices on the second floor. Given this agreement, it would have been unreasonable for Appellant to have believed that he had a right to exclude Sankey, Sankey's agents, or any other individual from accessing the second-floor entryway or the second-floor hallway. To be sure, at the very least, Sankey possessed the unrestrained right to enter the second floor of his building, walk down the second-floor hallway, and occupy the four remaining offices on the second floor. Further, Sankey possessed the unrestrained ability to lease the four remaining offices to anyone, at any time, and without informing Appellant. Finally, Sankey possessed the right to allow anyone access to any of the four remaining offices, at any time – thus, a reasonable person would have been aware that, at any time, an individual could enter the second floor and walk down the hallway to access one of the four remaining offices.

As such, we conclude that Appellant did not have the right to exclude authorized individuals from the second-floor entryway or the second-floor

hallway and that, under the totality of the circumstances in this case, Appellant did not possess a legitimate expectation of privacy in those common areas.[6] *See also Commonwealth v. Gordon*, 683 A.2d 253 (Pa. 1996) (holding that the defendant did not establish that he had a legitimate expectation of privacy in the dining room of an abandoned house, as the defendant did not establish that he had a right to exclude others from the

_____

[6] Appellant analogizes his case to our opinion in *Commonwealth v. Davis*, 743 A.2d 946 (Pa. Super. 2009). In *Davis*, we held that – even if a landlord has the right to enter a tenant's apartment for maintenance and inspection purposes – the landlord does not have the ability to consent to a police search of his tenant's apartment. The *Davis* Court explained:

> [The landlord's] right to occupancy [of the defendant's apartment] was neither equivalent to nor greater than [the defendant's]. The fact that [the landlord] had authority under the lease to enter the apartment to inspect or repair the premises and had given notice of the up-coming inspection did not permit the police to disregard [the defendant's] Fourth Amendment rights by accepting [the landlord's] invitation to enter the apartment, thereby subjecting [the defendant] to an unreasonable search and seizure of evidence.

*Id.* at 951.

*Davis* does not apply to the case at bar because, in this case, Appellant did not have a contractual right to live in more than one of the rooms on the second floor, to occupy the second-floor hallway, or to exclude authorized persons from the remaining offices on the second floor. Instead, Sankey retained the right to occupy – or to allow others to occupy or visit – the remaining offices on the second floor and, thus, the right to utilize the second-floor entryway and hallway. Therefore, since Appellant did not possess a contractual right to control the second-floor entryway or hallway – and since Sankey did have that right – *Davis* is inapposite to the case at bar.

room). Therefore, we conclude that Appellant's claim – that the corporals' entry into the second floor of the office building violated his constitutional right to be free from unlawful search and seizure – fails.[7]

Judgment of sentence affirmed.

Judge Bowes joins this Memorandum.

Judge Strassburger files a Concurring Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/9/2016

---

[7] Further, we agree with the trial court's conclusion that, "even if the [police] did not have actual authority to enter the [second-floor entryway or hallway,] the [police] would have been able to enter under the apparent authority rule enunciated under **Commonwealth v. Blair**, 575 A.2d 593 (Pa. Super. 1990)." Trial Court Opinion, 4/14/15, at 6 n.4.